UTAH CONSOL. MINING CO. v. BATEMAN.

(Circuit Court of Appeals, Eighth Circuit. February 16, 1910.)

No. 3,103.

*(Syllabus by the Court.)*

**1.** MASTER AND SERVANT (§ 205*) — NEGLIGENCE — ASSUMPTION OF RISK—RE-LIANCE ON CARE OF MASTER.

It is the duty of the master to exercise ordinary care to provide a reasonably safe place for the servant to work and reasonably safe appliances for him to use, and unless he knows, or the fact is obvious, that this duty has not been discharged by the master, he may assume that it has been, and may recover for any injury resulting from the failure to discharge it.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 547–549; Dec. Dig. § 205.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

**2.** MASTER AND SERVANT (§ 226*)—ASSUMPTION OF RISK—NEGLIGENCE OF MASTER.

But the servant assumes all the ordinary risks and dangers of the employment upon which he enters and in which he continues without complaint, including those resulting from the negligence of his master which are known and appreciated by him and those which would have been known and appreciated by a person of ordinary prudence and care in his situation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 662; Dec. Dig. § 226.*]

**3.** MASTER AND SERVANT (§ 219*) — ASSUMPTION OF RISK — APPRECIATION OF DANGER—OBVIOUS DANGERS.

A servant cannot be heard to say that he did not appreciate or realize the danger where the defect from the negligence of the master was obvious and the danger from it would have been apparent to an ordinarily prudent person of his intelligence and experience in his situation.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 610–624; Dec. Dig. § 219.*]

**4.** MASTER AND SERVANT (§ 217*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

The plaintiff below, an employé of the defendant, had for two years been and was a skimmer, one of whose duties was to skim or rake the slag from the molten metal in the converter. As he stood before the mouth of the converter to skim the metal, an explosion occurred in the clay lining of the converter, which threw the molten metal out of the mouth of the converter upon him, and burned him. He recovered a judgment against the defendant for negligence, in that it used coal mixed with the droppings from the grates of the reverberatory furnaces to dry the clay lining in this converter. For three months before the accident the plaintiff had used converters dried with this mixed fuel, and had subjected them to the test of the molten metal. The plaintiff knew that, if moisture remained in the clay lining and the molten metal came in contact with it, there might be an explosion; that the defendant had used this mixed fuel to dry the converters, and that it used it to dry this converter; that there had been explosions in converters dried by the use of this fuel; that, if an explosion occurred while he stood in front of the mouth of the converter, it might throw the molten metal out the mouth upon him and injure him. Nevertheless he remained in the employment of the defendant without complaint.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*Held,* the plaintiff assumed the risk and danger from the use of the mixed fuel to dry the converters, and he could not recover.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 595; Dec. Dig. § 217.*]

Riner, District Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Utah.

Action by James Bateman against the Utah Consolidated Mining Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

William H. King, for plaintiff in error.

Dey & Hoppaugh, for defendant in error.

Before SANBORN, Circuit Judge, and RINER and WILLIAM H. MUNGER, District Judges.

SANBORN, Circuit Judge. James Bateman, the plaintiff below, was burned by an explosion in a converter which threw molten metal out of its mouth upon him as he stood in front of it to skim the slag from the metal. He sued his employer, the Utah Consolidated Mining Company, a corporation, and alleged that the presence of moisture in the parts of the converter subjected to contact with the molten metal renders them liable to explode and to throw the metal out of the converter, and that the defendant was so negligent in the preparation and inspection of the converter used by him that there was moisture in the clay with which it was lined where it was liable to come in contact with the molten metal and to cause an explosion, and that this moisture came in contact with this metal and caused the explosion which injured him. The defendant denied its alleged negligence, and pleaded that the plaintiff knew and assumed the risk and danger of the accident and injury.

At the close of the trial, the evidence had conclusively disposed of every charge of negligence except the claim which was not set forth in the pleadings, but was developed during the evidence, that the defendant had used to dry the converter in question inefficient fuel consisting of a mixture of coal and the droppings from the grates of the reverberatory furnaces which consisted of unburned and partially burned coal varying in size from that of a walnut to that of a pea, and which was called by some witnesses ashes, and which will be called for convenience in this opinion "gratings." The only issues, therefore, which the court submitted to the jury were whether or not this fuel was used to dry the converter, whether or not it was negligence for the defendant to use it, whether or not the plaintiff assumed the risk of its use, and whether or not he was guilty of contributory negligence. The jury returned a verdict for the plaintiff, and the defendant now complains that the court denied its request to instruct the jury to return a verdict in its favor, because, as its counsel contends, there was no substantial evidence of the negligence of the company, and the evidence was conclusive that the plaintiff assumed the risk of the use of this mixed fuel to dry the converter which injured him.

If all conflicts in the testimony be resolved as they should be in this investigation in favor of the plaintiff, the evidence established these

facts: The converters used by the defendant were egg-shaped vessels eight or ten feet high with mouths in their smaller upper ends two feet in diameter. They consisted of shells of wrought iron or steel from one-half to five-eighths of an inch in thickness, made in two parts, which were joined together at a point about midway between their ends, and a lining of brick and clay. The brick was placed against the shell of each converter to keep the hot metal from the wrought iron or steel as the clay cracked, burned, or fell away. Inside this brick lining, a lining of wet clay from 16 to 24 inches in thickness at the bottom tapering to 3 inches in thickness at the top was placed. After a converter had been thus lined; coal or coal and gratings were placed within it and set on fire, and a blast was applied to dry this clay. At the base and back of the converter were twyer holes about the size of the fingers, through which a puncher pushed a rabble into the molten mass after the converter was charged for the purpose of letting the air through the molten metal to keep it rolling, and to separate the slag from the copper. Each converter was supplied with a wind box back of these holes which was capable of connection by a blast pipe with compressed air; and was used to send this air through these twyer holes to drive the fire which dried the linings and after the converter was charged to roll the molten mass and separate the slag from the metal. Each converter sat upon four wheels, and was so mounted that it could be turned down to a horizontal or nearly horizontal position and back again to an upright position by the puncher at will.

The clay linings were put into the converters at a point about 12 feet distant from the plaintiff's station so that he saw and knew how they were lined. After they had been lined each converter was taken past the plaintiff to the drying station about 30 steps distant from him where it was fired, subjected to a blast, and the clay lining was dried. It ordinarily requires from 4 to 18 hours, according to the character of the fuel and the fire, to dry a converter properly. The converter in which the accident occurred was dried 30 hours from the time it was lined and fired to the time it was taken from the drying station to be used. During and after its firing it was watched and inspected with reasonable care by the foreman and servants of the defendant, and it appeared to them to be dry and safe. The defendant's foreman sometimes delivered to the plaintiff for use immediately after a short drying of four or five hours converters that he informed the plaintiff were green, and, when Bateman skimmed or raked the slag from the metal in one of these converters, he stood to one side of its mouth in order to avoid any injury from explosions therein. But the foreman believed this converter to have been dried as well as any converter that had ever been used by the defendant, and, when Bateman asked him if it was ready, he replied that it was. A charge of molten metal was put into it, blown and skimmed by the plaintiff. He saw the lining within it during this operation, and it appeared to him to be dry and safe. The molten metal of this first charge came in contact with the inner portion of the lining and no explosion occurred, and, when the plaintiff took his station to skim the second and fatal charge, he stood directly in front of the mouth of the converter, and the explosion threw the burning metal upon him.

All the moisture is not dried out of the clay lining of converters in the customary process of drying them for this use, but some remains in the part of the lining nearest to the brick. The purpose of the drying is to dry sufficiently to form a safe crust on the side of the clay exposed to the burning metal and to drive out such moisture in the lining as will be likely to cause an explosion. It is not always possible to determine by examination or inspection whether or not there remains next to the brick too much moisture. Clay linings dried with reasonable care and apparently safe are sometimes green next to the brick. When a converter is charged, the molten metal sooner or later finds or causes cracks in the clay, makes great chunks of it fall off into the metal, and eats large holes in it, and finally destroys it. These clay linings last only about eight hours of constant use, endure only from four to eight charges, and sometimes fail during the first charge. When the lining is broken so that it is useless, the converter is again lined with clay and dried. Sometimes, if one or two holes in the lining appear, a green patch or patches of clay are placed upon the lining, and the converter is continued in use for a time.

The defendant had been using a mixture of coal and gratings to dry its converters continually from three to eight months before this accident occurred. This mixture of coal and gratings did not dry the converters as well as coal alone, and did not dry them thoroughly. There had been explosions in the converters during the three months during which this mixed fuel was used to dry them. The plaintiff had been employed by the defendant in his position as skimmer for more than two years. He knew before the accident happened that the gratings had been and were used with coal for the purpose of drying the converters, that there had been explosions while this fuel was used, and about two weeks before the accident he told one of the foremen that the boys were in some doubt in relation to this fuel, and had asked the foreman if it dried the converters thoroughly, and the latter answered that it did. The plaintiff made no complaint but continued in his employment.

Bateman was a skimmer. It was his duty to see that the punchers and helpers coupled the converters together properly so that the ore would not escape, to conduct the operation of drawing the molten metal from the furnace into the converter, blowing the molten mass so that the slag would separate from the metal, skimming or raking off the slag, and then pouring the pure metal into the moulds. On the night of this accident he directed his puncher to bring the converter in which the explosion occurred up from the drying station, and to charge it with matte drawn from the furnaces. His order was obeyed. Bateman then caused the blast of air to be put on and to blow up through the twyer holes and the molten metal until the charge was high; that is to say, until the colors in the flames indicated to him that the slag was separated. Then he ordered the craneman to bring the converter to him, and, when it arrived, he directed his puncher to turn the mouth of the converter down so that he could see into it and skim the metal within, and then to shut off the air. The puncher obeyed. Bateman then skimmed the slag from the mass, poured a half pot of metal into it, turned the converter back into an upright position, turned on the

blast, and, when the charge was high again, the puncher on his order turned the mouth of the converter down again, and shut off the air. Bateman stepped directly in front of the mouth of the converter, examined the molten metal within, found it perfectly quiet, motioned his helper to turn the mouth still further down, and the explosion at once occurred, threw the hot metal over and burned him. He testified that the explosion was unusual, and that he knew from his experience that the cause of it was wet moisture within the lining of the converter with which the hot metal had come in contact. Bateman's occupation was one in which there was great and manifest danger of personal injury from the escape of the molten metal from the mouths of the converters. Soon after the metal was introduced into a converter, it cracked or ate into the clay lining, and caused great chunks of it to fall into the hot mass and to splash it out through the mouth. When a converter was charged and the puncher was ready to turn the mouth of it up, it was necessary to put the air on in order to keep the hot metal from filling the twyer holes so that there would be no blast through the mass, but, when the mouth was turned up as the metal flowed over the holes, the blast blew it out through the mouth of the converter, often far across the building. The same result followed the turning of the mouth down for the air cannot be taken off until the metal has receded from the holes.

When a lining of a converter is green and the hot metal gets in contact with the moisture, there may be an explosion from that cause which will throw the metal out, but when the mouth of the charged converter is turned down and the air is shut off, and the metal is not moved, there is no danger in skimming it if there is no moisture in the lining with which the metal may come in contact. The plaintiff testified regarding this molten mass in the converter as follows:

"I have seen it splash out and boil out, and I have seen it blow out. * * * Q. Every time you were there you would see there would be some metal blowing out, wouldn't you? A. Yes, sir.

"Q. You never saw a converter while you were on duty a single time that you were there that some of the metal did not blow out of the mouth? A. No, sir.

"Q. It would blow from various causes, would it not? A. It would blow out from a hundred causes. * * *

"Q. You knew it would blow out when the converters were green? A. Yes; when the air is on and off.

"Q. You knew it would blow out when no air in the converter too? A. Yes, sir.

"Q. You knew moisture would cause the metal to blow out? A. Yes, sir. * * *

"Q. You knew they had been using ashes? A. Yes, sir.

"Q. You knew there had been explosions? A. Yes, sir.

"Q. And that, if a man stood right in front there and an explosion occurred, he would get hurt? A. I know if he stood there, and an explosion occurred, he would get hurt.

"Q. You knew that since they were using ashes there, that there had been explosions, and you went and told him (the foreman) about it? A. Yes; about this. * * *

"Q. The converters were occasionally green, were they, because they blew out, as you say, hundreds of times? A. Yes, sir.

"Q. And you knew they were green at times? A. Yes, sir.

"Q. That is, you could tell when the explosion occurred that they were green? A. When they were reported green and brought there green.

"Q. Sometimes they would be green when you would not know it? A. No, sir.

"Q. Would there be when you would know it? A. There might have been when I didn't know it.

"Q. And then it would be possible that they would be green without being reported to you? A. Yes, sir; possibly being green without being reported to me.

"Q. Sometimes it happens, does it not, that the clay will look apparently dry, and still be green underneath? A. I suppose it does; yes.

"Q. You knew then from your long experience there that converters were being used that were green? A. Yes, sir.

"Q. And you knew what the consequence was? A. Yes, sir. * * *

"Q. And you had no reason to believe that any different rule had been followed with respect to the lining of this than.had been followed in the lining of others? A. No, sir.

"Q. In fact, you knew it was lined in the same way? A. As near as I knew anything about it.

"Q. The same men? A. Yes, sir.

"Q. Blazzard and Newhold? A. Yes, sir.

"Q. Working right there with you within a few feet of you? A. Yes, sir.

"Q. And so far as you could observe they had lined this just as they had lined all the others? A. Yes, sir.

"Q. And this had been set there just as all the others had been set out? A. Yes, sir. * * *

"Q. At any rate, by reason of your long experience in connection with converters and taking charge of them and using them, you knew that explosions were frequently caused there by reason of the use of green converters? A. Yes, sir. * * *

"Q. And, of course, the green converters where you had seen the explosions, numerous explosions, which enabled you to testify as to the cause of the explosion, were those which you and others of your associates there were using right along from day to day and month to month and year to year, weren't you? A. Yes, sir.

"Q. And yet you continued to work there knowing the fact that explosions would occur? A. Yes, sir.

"Q. And knowing from your long experience there what causes the explosions? A. Yes, sir.

"Q. Knowing that when these explosions—that these explosions might come at any time? A. Yes, sir.

"Q. Knowing that they came from moisture in the converters? A. Yes, sir.

"Q. Knowing that there was apt to be moisture in the converters at any time—that is, in any converter—from your long experience there? A. No, sir.

"Q. You said half a dozen times—pardon me for recurring to it—that there would be moisture in the converters? A. Yes, sir; not in any converter.

"Q. You made the statement before, in the converters which you were using there? A. Yes, sir.

"Q. This No. 4 converter was one that was in constant use there, was it not? A. Yes, sir.

"Q. The same as the rest of them? A. Yes, sir.

"Q. And I say now, knowing the fact that there was sometimes moisture in the converters, and that it would produce explosions, you continued to work there? A. Yes, sir.

"Q. And you knew that explosions might occur at any time, didn't you? A. Yes, sir.

"Q. And you knew that if you stood right in front of the mouth of that converter, under those circumstances, you would be burned? A. Yes, sir.

"Q. And you didn't quit? A. No, sir."

If in the state of the facts and the testimony which has now been set forth the defendant was guilty of any negligence in this case, it consisted in the use of the gratings with the coal to dry the converters. But the plaintiff knew that the defendant had been using these gratings for this purpose for at least three months. He had been using and

subjecting to the actual test of trial converters dried with this fuel. It is obvious that the utmost care in drying and in inspection would be less certain to determine whether or not this fuel was drying the converters properly than the actual subjection of them to the molten metal which their linings were made to resist. It might be and probably was difficult, if not impossible, to ascertain in every case by reasonable care in drying and inspecting whether or not a converter was dried sufficiently. But the charging and the use of a converter determined that issue unerringly in every case. For three months the plaintiff had been subjecting converters dried with this fuel to this unerring test, and, if the fuel failed to dry them properly, he knew that fact better than the defendant or any of its witnesses. He also knew that, if moisture remained in the lining of a converter so that the molten metal came in contact with it, there might be an explosion. He knew that there had been explosions in the converters while the mixed fuel was used to dry them, and he knew that, if an explosion occurred when he stood in the front of the mouth of a charged converter, he would be injured. His attention had been called especially to this fuel and its effect two weeks before, for he testifies that he then told the foreman that the boys were afraid that the ashes did not thoroughly dry the converters. The foreman assured him that they did. He made no complaint, but continued in his employment.

While it is the duty of the master to exercise ordinary care to provide a reasonably safe place for the servant to work, and reasonably safe appliances for him to use, and while, unless he knows, or the fact is obvious, that this duty has not been discharged by the master, he may assume that it has been, and may recover for any injury resulting from the master's failure to discharge it, yet he assumes all the ordinary risks and dangers of the employment upon which he enters and in which he continues, including those resulting from the negligence of his master which are known to and appreciated by him, and those which would have been known to and have been appreciated by a person of ordinary prudence and care in his situation. Nor can a servant be heard to say that he did not appreciate or realize the danger when the defect or negligence was obvious and the dangers would have been apparent to an ordinarily prudent person of his intelligence in his situation. St. Louis Cordage Co. v. Miller, 126 Fed. 495, 501, 509, 511, 61 C. C. A. 477, 483, 491, 493, 63 L. R. A. 551; Glenmont Lumber Co. v. Roy, 126 Fed. 524, 528, 61 C. C. A. 506, 510; Lamson v. American Axe & Tool Co., 177 Mass. 144, 145, 58 N. E. 585, 83 Am. St. Rep. 267; Sullivan v. Simplex Electrical Co., 178 Mass. 35, 39, 59 N. E. 645; Chicago, Milwaukee & St. P. Ry. Co. v. Benton, 132 Fed. 460, 462, 65 C. C. A. 660, 662; Choctaw, Oklahoma & Gulf R. R. Co. v. McDade, 191 U. S. 64, 67, 68, 24 Sup. Ct. 24, 48 L. Ed. 96; Chicago Great Western Ry. Co. v. Crotty, 141 Fed. 913, 915, 73 C. C. A. 147, 149, 4 L. R. A. (N. S.) 832; Burke v. Union Coal & Coke Co., 157 Fed. 178, 180, 181, 84 C. C. A. 626, 628, 629.

If the defendant was guilty of causal negligence by the use of the mixed fuel, it was only because explosion and injury were the natural and probable consequences thereof, and might reasonably have been anticipated therefrom. If it was the duty of the defendant to use

coal alone and to avoid the use of gratings in drying the converters, the plaintiff knew that the company had failed to discharge that duty. And, if the defendant might have reasonably anticipated and could have known and appreciated the risk and danger of the use of this fuel and of the explosion and injury therefrom, much more must the plaintiff have known and appreciated them; for, in view of his knowledge of the use of the fuel, of the danger from the moisture in the linings of the converters, and of his continual test of linings dried by this fuel for three months by their actual exposure to the molten metal, these risks and dangers were far more obvious to him, or to a man of ordinary prudence in his situation than to one in the situation of the defendant, or of its other employés. The conclusion is that the evidence established the facts that the plaintiff knew of the use of the mixed fuel by the defendant to dry the converters and knew and appreciated, and therefore assumed, the risk and danger therefrom. For this reason, the court erred in its refusal to direct a verdict for the defendant. It is unnecessary to consider other specifications of alleged error at the trial, and the judgment below must be reversed and the case must be remanded for a new trial; and it is so ordered.

RINER, District Judge, dissents.